IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY A. TUTTLE, | : | |
| | : | |
| Plaintiff | : | CIVIL NO. 4:10-CV-1392 |
| | : | |
| vs. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER OF SOCIAL | : | (Judge Rambo) |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

MEMORANDUM AND ORDER

Background

The above-captioned action is one seeking review
of a decision of the Commissioner of Social Security
("Commissioner") denying Plaintiff Timothy A. Tuttle's
claim for social security disability insurance benefits
and supplemental security income benefits.  For the
reasons set forth below we will remand the case to the
Commissioner for further proceedings.

Disability insurance benefits are paid to an
individual if that individual is disabled and "insured,"
that is, the individual has worked long enough and paid
social security taxes.  The last date that a claimant
meets the requirements of being insured is commonly

referred to as the "date last insured."  It is undisputed that Tuttle met the insured status requirements of the Social Security Act through December 31, 2010. Tr. 11, 13 and 109.[1]

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.  Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Tuttle was born in the United States on April 22, 1957. Tr. 79-80, 101 and 106.  Tuttle graduated from high school in 1975 and can read, write, speak and understand English and do basic mathematical functions. Tr. 78, 118 and 177.  After graduating from high school Tuttle obtained additional vocational training as a machine operator. Tr.  123.  He also obtained certificates in welding and blue print reading. Tr. 177.

_____

1.  References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on September 10, 2010.

Records of the Social Security Administration reveal that Tuttle had a 32-year history of employment and earnings as follows:

| Year | Earnings |
|------|----------|
| 1974 | $      8.00 |
| 1975 | 1133.02 |
| 1976 | 4339.21 |
| 1977 | 5684.15 |
| 1978 | 6099.77 |
| 1979 | 8441.33 |
| 1980 | 9649.82 |
| 1981 | 10140.55 |
| 1982 | 11067.84 |
| 1983 | 13122.09 |
| 1984 | 13305.50 |
| 1985 | 14764.22 |
| 1986 | 15635.74 |
| 1987 | 17015.04 |
| 1988 | 19602.39 |
| 1989 | 19441.40 |
| 1990 | 22774.97 |
| 1991 | 31035.68 |
| 1992 | 35453.75 |
| 1993 | 30418.06 |
| 1994 | 23201.33 |
| 1995 | 31217.88 |
| 1996 | 36713.70 |
| 1997 | 38380.97 |
| 1998 | 17737.30 |
| 1999 | 17248.25 |
| 2000 | 22332.19 |
| 2001 | 22933.37 |
| 2002 | 23567.53 |
| 2003 | 20862.23 |
| 2004 | (No Earnings) |
| 2005 | 6772.71 |
| 2006 | 6481.21 |

Tr. 110.  Tuttle's total earnings were $556,581.23.  <u>Id.</u>

Tuttle's past relevant employment[2] was as a machine

operator and mechanic's helper. Tr. 53.  Tuttle's past

relevant employment was classified as unskilled to semi-

skilled, medium to heavy work.[3]

---

2.  Past relevant employment in the present case means
work performed by Tuttle during the 15 years prior to
the date his claim for disability was adjudicated by
the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

3.  The terms sedentary, light, medium and heavy work
are defined in the Social Security regulations as
follows:

> (a) *Sedentary work*. Sedentary work involves
> lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like
> docket files, ledgers, and small tools.
> Although a sedentary job is defined as one
> which involves sitting, a certain amount of
> walking and standing is often necessary in
> carrying out job duties.  Jobs are sedentary if
> walking and standing are required occasionally
> and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no
> more than 20 pounds at a time with frequent
> lifting or carrying of objects weighing up to
> 10 pounds.  Even though the weight lifted may
> be very little, a job is in this category when
> it requires a good deal of walking or standing,
> or when it involves sitting most of the time
> with some pushing and pulling of arm or leg
> controls.  To be considered capable of
> performing a full or wide range of light work,

(continued...)

Tuttle worked as a mechanic's helper for United States Surgical Corporation in Connecticut from 1978 to June, 1997. Tr. 111 and 140.  In 1997 while working for United States Surgical Corporation Tuttle allegedly injured his back while lifting an item weighing about 50 pounds. Tr. 145.  Tuttle then worked from 1998 to October, 2003, for J. Calzone, Inc., as a laborer

---

3.   (...continued)
you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

installing sheet metal ducts weighing 50-80 pounds. Tr.
111-112 and 140.   Tuttle was unemployed in 2004.   In
2005 and 2006 Tuttle obtained work as a manual laborer
through an employment placement agency. Tr. 112 and 140-
141.

Tuttle claims that he became disabled on July 1,
2006, because of a kidney stone and leg and back pain.
Tr. 119.  He also claims he suffers from panic attacks
and is "fearful of crowds and avoids people." Tr. 169.
Tuttle has not engaged in any substantial gainful work
activity since July 1, 2006, the alleged disability
onset date. Tr. 13.

On January 17, 2007, Tuttle protectively filed
an application for social security disability insurance
benefits and an application for supplemental security
income benefits. Tr. 11, 79 and 100-108.[4]  On July 25,

_____

4.  Protective filing is a term for the first time an
individual contacts the Social Security Administration
to file a claim for benefits.  A protective filing date
allows an individual to have an earlier application
date than the date the application is actually signed.

2007, the Bureau of Disability Determination[5] denied Tuttle's applications. Tr 79-90.[6]  On August 20, 2007, Tuttle requested a hearing before an administrative law judge. Tr. 93-94.[7]  After approximately fifteen months had passed a hearing was held before an administrative law judge on December 3, 2008. Tr. 19-60.  On February 19, 2009, the administrative law judge issued a decision denying Tuttle's applications for benefits. Tr. 11-18. On March 27, 2009, Tuttle filed a request for review of

---

5.  The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration. Tr. 79-80.

6.  Although noted in the index of the administrative record, pages 81-90 are missing from the administrative record.  Doc. No. 8-2, Court Transcript Index.  Those documents – Notices of Disapproved Claims –  are helpful at times in determining the impairments alleged by a plaintiff but the absence of those documents does not preclude us from issuing a decision in the present case.

7.  Although noted in the index of the administrative record, pages 93-94 are missing from the administrative record.  Doc. No. 8-2, Court Transcript Index.  Those documents are not essential and their absence does not preclude us from issuing a decision in the present case.

the administrative law judge's decision with the Appeals Council of the Social Security Administration. Tr. 6-7. After more than 13 months had passed, the Appeals Council on May 6, 2010, concluded that there was no basis upon which to grant Tuttle's request for review. Tr. 1-5.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On July 6, 2010, Tuttle filed a complaint in this court requesting that we reverse the decision of the Commissioner and award him benefits, or remand the case to the Commissioner for further proceedings.

The Commissioner filed an answer to the complaint and a copy of the administrative record on September 10, 2010.  Tuttle filed his brief on January 5, 2011, and the Commissioner filed his brief on February 1, 2011.  The appeal[8] became ripe for disposition on February 18, 2011, when Tuttle elected not to file a reply brief.

---

8.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported

by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. § 404.1520 and 20

C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.   This

process requires the Commissioner to consider, in

sequence, whether a claimant (1) is engaging in

substantial gainful activity,[9] (2) has an impairment

that is severe or a combination of impairments that is

severe,[10] (3) has an impairment or combination of

---

9.  If the claimant is engaging in substantial gainful
activity, the claimant is not disabled and the
sequential evaluation proceeds no further. Substantial
gainful activity is work that "involves doing
significant and productive physical or mental duties"
and "is done (or intended) for pay or profit."   20
C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

10.   The determination of whether a claimant has any
severe impairments, at step two of the sequential
evaluation process, is a threshold test. 20 C.F.R. §§
404.1520(c) and 416.920(c). If a claimant has no
impairment or combination of impairments which
significantly limits the claimant's physical or mental
abilities to perform basic work activities, the
claimant is "not disabled" and the evaluation process
ends at step two. Id.   If a claimant has any severe
impairments, the evaluation process continues.   20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g).
Furthermore, all medically determinable impairments,
severe and non-severe, are considered in the subsequent
steps of the sequential evaluation process.   20 C.F.R.
§§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).
An impairment significantly limits a claimant's
physical or mental abilities when its effect on the
claimant to perform basic work activities is more than

(continued...)

impairments that meets or equals the requirements of a
listed impairment,[11] (4) has the residual functional
capacity to return to his or her past work and (5) if
not, whether he or she can perform other work in the
national economy. Id.  As part of step four the
administrative law judge must determine the claimant's
residual functional capacity. Id.[12]

Residual functional capacity is the individual's
maximum remaining ability to do sustained work

_____

10.  (...continued)
slight or minimal. Basic work activities include the
ability to walk, stand, sit, lift, carry, push, pull,
reach, climb, crawl, and handle. 20 C.F.R. §
404.1545(b).  An individual's basic mental or non-
exertional abilities include the ability to understand,
carry out and remember simple instructions, and respond
appropriately to supervision, coworkers and work
pressures. 20 C.F.R. § 1545(c).


11.  If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment,
the claimant is disabled. If the claimant does not have
an impairment or combination of impairments that meets
or equals a listed impairment, the sequential
evaluation process proceeds to the next step.

12.  If the claimant has the residual functional
capacity to do his or her past relevant work, the
claimant is not disabled.

activities in an ordinary work setting on a regular and continuing basis.  <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities. <u>Id.</u>; 20 C.F.R. §§ 404.1545 and 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the errors committed by him, we will review in detail Tuttle's medical records.

The first medical record that we encounter is from 2006.  On September 26, 2006, Tuttle had an

15

appointment with his primary care physician, Emma Rubin, M.D. Tr. 215.  On that date Tuttle complained of pinching pain in the right lower quadrant of his trunk and increased urinary frequency (two to three time at night) as well as a problem urinating. Id.  He stated to Dr. Rubin that he was told that he had a kidney stone. Id.  The physical examination revealed that Tuttle's blood pressure was 120/80, his height was 6'1" and he weighed 153 pounds. Id.  There were no abnormal physical examination findings noted. Id.  It was specifically stated that Tuttle had "no CVA tenderness."[13]  Id. Under the impression section of Dr. Rubin's medical notes she states that Tuttle was suffering from urinary

_____

13.  "CVA" refers to the costovertebral angle which is the acute angle formed between the lowest rib and the vertebral column. Pain at this area is usually attributed to kidney disease. Costovertebral Angle - definition of costovertebral angle in the Medical Dictionary - by the Free Online Dictionary, Mosby's Medical Dictionary, 8th Edition, 2009, http://medical -dictionary.thefreedictionary.com/costovertebral+angle (Last accessed August 24, 2011).

frequency and possibly benign prostatic hyperplasia[14] or possibly a urinary tract infection. <u>Id.</u> Dr. Rubin ordered diagnostic tests including a urine culture and a complete blood count. <u>Id.</u> Dr. Rubin also ordered a urology consultation and prescribed Flomax. <u>Id.</u>

On November 29, 2006, Tuttle had an appointment with Donald L. Preate, Jr., M.D., a urologist.[15] Tr. 185-187. When Dr. Preate reviewed Tuttle's systems with Tuttle, Tuttle denied suffering from nausea, vomiting.

---

14. The Mayo Clinic website describes benign prostatic hyperplasia or hypertorphy as follows:

> Prostate gland enlargement is a common condition as men get older. Also called benign prostatic hypertrophy, prostate gland enlargement can cause bothersome urinary symptoms. Untreated prostate gland enlargement can block the flow of urine of the bladder and can cause bladder, urinary tract or kidney problems.

Prostate gland enlargement, Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/prostate-gland-enlargement/DS00027 (Last accessed August 23, 2011).

15. Dr. Preate is with Delta Medix Urology located in Scranton, Pennsylvania. Tr. 185.

fevers, chills, headaches, dizziness, blurry vision, loss of vision, vertigo, chest pain, palpitations, pulmonary difficulties (such as shortness of breath), breathing problems, wheezing, gastrointestinal discomfort or pain, diarrhea, cachexia,[16] anorexia, hematochezia,[17] constipation, significant weight loss, major musculoskeletal problems, skin abnormalities, bleeding tendencies, and neurological deficits.  Dr. Preate in his report of the appointment noted Tuttle's reported history of nephrolithiasis (kidney stones) as well as voiding dysfunction and, under the physical examination portion of his report, noted no abnormal findings.  Specifically, Dr. Preate stated "[h]e has no costovertebral angle tenderness.  The paraspinal muscles are without discomfort or pain to palpation." Tr. 186.

---

16.  Cachexia is "a profound and marked state of constitutional disorder; general ill health and malnutrition." Dorland's Illustrated Medical Dictionary, 250 (27th Ed. 1988).

17.  Hematochezia is "the passage of bloody stools." Dorland's Illustrated Medical Dictionary, 741 (27th Ed. 1988).

18

Dr. Preate noted that Tuttle's American Urological Association Benign Prostatic Hyperplasia symptom score was 21. Id.  A self-reported score of 20 to 35 is considered severe.  Enlarged Prostate and Your BPH Symptoms Score, WebMD, http://men.webmd.com/enlarged -prostate-your-bph-symptoms-score (Last accessed August 23, 2011).  Tuttle's prostate blood test was normal. Tr. 186.  Dr. Preate's impression was that Tuttle was suffering from a voiding dysfunction, a history of right sided flank pain, a history of kidney stones, unspecified, and a history of smoking. Tr. 186-187.  Dr. Preate prescribed the drug Hytrin,[18] ordered a renal ultrasound and a kidney, ureter and bladder (KUB) x-ray, and scheduled a follow-up appointment in six weeks. Tr. 187.

On December 21, 2006, Dr. Rubin examined Tuttle and completed on behalf of Tuttle a document entitled

_____

18.  Hytrin is a drug that makes it easier to urinate by relaxing the muscles in the prostate and bladder neck. Hytrin, Drugs.com, http://www.drugs.com/hytrin.html (Last accessed August 24, 2011).

"Pennsylvania Department of Public Welfare Employability Assessment Form." Tr. 180-181 and 214.  In the Employability Assessment form Dr. Rubin stated that Tuttle was temporarily disabled for less than twelve months beginning November 1, 2006, and lasting until November 1, 2007.  Tr. 181.  Dr. Rubin's diagnosis was that Tuttle suffered from right kidney nephrolithiasis, benign prostatic hyperplasia and varicose veins. Id. Her assessment was based on a physical examination of Tuttle, review of medical records and Tuttle's clinical history. Id.

On February 21, 2007, Tuttle had an x-ray of his abdomen done which revealed "a calcific density overlying the lower pole of the left kidney." Tr. 191. However, it was stated that this finding might be related to "gas and feces" in the large intestine. Id.

Sometime in February, 2007, Tuttle had an appointment with Dr. Rubin.[19] Tr. 213.  Dr. Rubin noted

_____

19.  The date on the record of this appointment is illegible.

that Tuttle's back problem was acting up and Tuttle also had varicose veins. Id.  Under the physical examination portion of Dr. Rubin's report of this appointment there were no abnormal findings noted. Id.  Dr. Rubin's impression was that Tuttle was suffering from chronic back pain and varicose veins. Id.  She ordered an x-ray and an MRI of the lumbar spine and recommended that Tuttle take Motrin on an as needed basis("motrin prn"). Tr. 213.

On March 2, 2007, Tuttle had a lower extremity venous duplex evaluation conducted by Sara Goerlitz, technologist and reviewed by Edward L. Batzel, M.D. Tr. 226.  This diagnostic evaluation revealed no evidence of deep venous or superficial thrombosis bilaterally. Id. However, the evaluation revealed reflux in the right common femoral vein and in the bilateral greater saphenous veins below the knees upon standing. Id.  A physical examination of Tuttle's legs revealed varicosities bilaterally. Id.

Also, on March 2, 2010, Tuttle had an x-ray done of the lumbar and sacral spine which revealed moderate degenerative disc disease at the L4-L5 level with mild spondylosis and mild scoliosis of the lumbar spine. Tr. 228. The scoliosis was oriented toward the left (levoscoliosis). Id. The x-ray revealed mild osteophyte (spur) formation in the lumbar spine. Id.

On March 7, 2007, Tuttle had an MRI done of the lumbar spine which revealed the following:

> Degenerative 3 lower lumbar discs with annular circumferential bulging at L4-L5 with extension the intervertebral foramina and bilateral foraminal narrowing and the possible nerve root compression. Mild annulus bulging at L3-L4 and L5-S1. No focal herniation and no bony canal stenosis. Levoscoliosis of the lumbar spine and no compression fracture or marrow infiltrative process.

Tr. 217-218.

On March 13, 2007, Tuttle had a psychiatric evaluation performed apparently by Guido Boriosi, M.D., at Advanced Community Service Associates, Scranton, Pennsylvania. Tr. 13 and 239. There is only one page of the report of this initial evaluation included in the

administrative record and that page does not indicate Tuttle's mental status, diagnosis or prognosis.   Id.

On March 20, 2007, Tuttle had an ultrasound of the kidneys which revealed an unremarkable right kidney and a 7 millimeter calculus (stone) in the lower pole of the left kidney. Tr. 225.  The kidney stone was positioned such that it did not obstruct the flow of urine. Id.

On April 3, 2007, Tuttle had a follow-up appointment with Dr. Preate at Delta Medix Urology.  Dr. Preate in his report of that appointment stated that Tuttle "had a kidney ultrasound and a KUB which showed a nonobstructing 7 mm stone in the lower pole of the left kidney.  He gets occasional twinge but this is not terribly bothersome.  At the present time he wishes to continue on conservative management[.]" Tr. 184.  Dr. Preate continued Tuttle on Hytrin and counseled Tuttle regarding his diet. Id.  A six month follow-up appointment was scheduled. Id.

Also, in April, 2007, Tuttle had an appointment with Dr. Boriosi. Tr. 238. The date on the report of the appointment is illegible. Id. Dr. Boriosi's mental status findings were benign. Id. He noted that Tuttle was friendly, alert and cooperative; Tuttle denied suicidal and homicidal thoughts; and Tuttle denied drug and alcohol usage. Dr. Boriosi stated that Tuttle was "doing better" and continued Tuttle's ongoing therapy and medication. Id. The record does not specify Tuttle's medications, other than Celexa.[20] Id.

On April 23, 2007, Tuttle had an appointment with Dr. Rubin. Tr. 212. At that appointment Tuttle complained of low back pain radiating to the right leg. Id. The physical examination revealed that Tuttle's blood pressure was 110/70 and he weighed 175 pounds. Id. There were no abnormal physical examination findings noted. Id. Dr. Rubin did note that the MRI of

_____

20. Dr. Boriosi's handwriting is difficult to decipher. Celexa is a drug used to treat depression. Celexa, Drugs.com, http://www.drugs.com/celexa.html (Last accessed August 24, 2011).

Tuttle's lumbar spine revealed nerve root compression. Id. Dr. Rubin's impression/diagnosis was that Tuttle suffered from lumbar degenerative disc disease[21] and

_____

21. Degenerative disc disease has been described as follows:

> As we age, the water and protein content of the cartilage of the body changes. This change results in weaker, more fragile and thin cartilage. Because both the discs and the joints that stack the vertebrae (facet joints) are partly composed of cartilage, these areas are subject to wear and tear over time (degenerative changes). The gradual deterioration of the disc between the vertebrae is referred to as degenerative disc disease. Wear of the facet cartilage and the bony changes of the adjacent joint is referred to as degenerative facet joint disease or osteoarthritis of the spine.
>
> Degeneration of the disc is medically referred to as spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal "disc space" between the adjacent vertebrae.

Degenerative Disc Disease & Sciatica, MedicineNet.com, http://www.medicinenet.com/degenerative_disc/page2.htm (Last accessed August 25, 2011). Degenerative disc disease is considered part of the normal aging process. Id.

lumbar radiculopathy.[22] Id.  Physical therapy was ordered along with the use of ultra sound and hot packs. Id.

On May 7, 2007, Tuttle had an appointment with Dr. Boriosi. Tr. 237.  Dr. Boriosi's mental status findings were benign. Id.  He noted that Tuttle was friendly, alert and cooperative; Tuttle denied suicidal and homicidal thoughts; and Tuttle denied drug and alcohol usage.  Dr. Boriosi stated that Tuttle was "doing good" and continued Tuttle's ongoing therapy and medication. Id.  The record does not specify Tuttle's medications, other than Celexa. Id.

---

22. Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord.  They carry signals to the rest of the body at each level along the spine. Radiculopathy is a result of disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy/article.htm (Last accessed August 25, 2011).  A herniated disc is one cause of radiculopathy. Id. Scoliosis also can cause radiculopathy. Id. Radiculopathy is a step beyond degenerative disc disease and severe cases may requires surgical intervention. Id.  However, "the majority of patients respond well to conservative treatment options." Id.

On May 8, 2007, Tuttle had an initial physical therapy evaluation at Mercy Health Partners, Rehabilitation Services, Scranton, Pennsylvania.  Tr. 208.  The physical therapist's examination of Tuttle revealed that Tuttle's "[a]ctive and passive range of motion of both lower extremities is within normal limits with 4+/5 strength throughout the left lower extremity, 4/5 strength throughout the right hip and knee [and] 4+/5 strength throughout the right ankle." Tr. 208.[23] Tuttle's active range of motion of the trunk (which includes the spinal column) was reduced by 50% with respect to flexion and left rotation and 25% with respect to extension, right rotation, left lateral flexion and right lateral flexion. Id.  Tuttle complained of increased pain with movement of the trunk. Id.  He also had muscle tightness in the lumbar and sacral areas with tenderness elicited by palpation on

_____

23.  5/5 is normal strength. Strength of Individual Muscle Groups, Neuroexam.com, http://www.neuroexam.com/ neuroexam/content.php?p=29 (Last accessed August 25, 2011).

the right. Id.  The physical therapist scheduled therapy
sessions "three times a week for four weeks for moist
heat, high-volt galvanic stimulation, ultrasound,
therapeutic exercises and a home exercise program." Id.

On May 8, 2007, Tuttle was examined by Toni Jo
Parmelee, D.O., a consultative examiner for the Bureau
of Disability Determination. Tr. 197-207.  Dr. Parmelee
listed Tuttle's current medications as Vicodin, Motrin,
Celexa and Hytrin. Tr. 198.  Tuttle told Dr. Parmelee
that he suffers from, inter alia, excessive thirst,
rashes, backache, joint pain and stiffness, abdominal
pain, frequent urination, kidney stones, muscle
weakness, difficulty breathing, severe pain in calves
when walking, anxiety and depression. Id.  Dr. Parmelee
stated that Tuttle does not use a cane, brace or walker
for ambulation. Tr. 199. Dr. Parmelee's findings on
physical examination of Tuttle were essentially normal
except with regard to Tuttle's back.

With regard to Tuttle's back Dr. Parmelee stated
as follows: "Mild C-curve scoliosis with a convexity to

28

the left with the apex in the lower thoracic area.  No
spinous tenderness.  Paraspinous muscles in spasm with
partial loss of lumbar lordosis.  Range of motion is
full without pain.  Straight leg raising test associated
with low back pain on left to 60 degrees and positive on
the right to 60 degrees, associated with low back pain
with no radiation into the legs, except for pulling in
the hamstring area." Tr. 200.  Dr. Parmelee also noted
that full range of motion of the hips causes pain in the
lower back. Tr. 201.

        With regard to Tuttle's gait and ability to move
around, Dr. Parmelee noted that

    [t]he patient stands straight and ambulates with
    no noticeable limp or favoring of the effected
    side.  The patient is able to squat and recover
to pick up shoes from the floor. He can arise from chair
that does not have arms and can get on and off the
examination table at a reasonable speed and without
assistance. The patient demonstrates stiffness of the
lower extremities and back when changing positions and
arising from a chair, forward bending to 45 degrees. The
patient is able to heel and toe-walk.

Tr. 201-202.

Dr. Parmelee's diagnosis was that Tuttle suffered from low back pain and had "[r]adicular findings consistent with an L4-L5 disc lesion with right sided radiculopathy" and "[m]ild scoliosis, functional with spasm with low back pain versus a structural lesion." Id. She also concluded that Tuttle suffered from chronic obstructive pulmonary disease, a history of kidney stones, and benign prostatic hypertrophy. Tr. 203.

Dr. Parmelee completed a document entitled "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities." Tr. 204. In that document Dr. Parmelee stated that Tuttle had the ability to occasionally lift up to 10 pounds and occasionally carry up to 20 pounds. Tr. 204.[24] Dr. Parmelee did not indicate what amount of weight Tuttle can frequently lift and carry.[25] Dr. Parmelee stated

_____

24. "Occasional" is defined as "from very little up to 1/3 of an 8 hour day." Tr. 204.

25. "Frequent" is defined as "from 1/3 to 2/3 of an 8

<span style="text-align:right;display:block">(continued...)</span>

that Tuttle had the cumulative capacity to stand and
walk a total of 4 hours in and 8-hour workday and that
Tuttle can sit 8 hours with alternating sitting and
standing at his option. Id.  The only limitation Dr.
Parmelee found regarding pushing and pulling was that
Tuttle can not engage in "[right] foot pedal work." Id.
With regard to postural activities, Tuttle can
occasionally bend, stoop, crouch, and balance and never
kneel or climb. Tr. 205.  According to Dr. Parmelee,
Tuttle has no other physical limitations such as
reaching, handling, fingering, and feeling and no
environmental limitations including those relating to
height, hazards and ventilation. Id.

On June 6, 2007, Tuttle had an appointment with
Dr. Rubin. Tr. 211.  At that appointment Tuttle
complained that his back was stiff in the morning and he
appears to have complained about his varicose veins.
Id.  The physical examination revealed that Tuttle's

---

25.  (...continued)
hour day." Id.

blood pressure was 120/80 and he weighed 173 pounds. Id. There were no abnormal physical examination findings noted. Id.  Under the impression section of Dr. Rubin's medical notes she states that Tuttle was suffering from lumbar radiculopathy and varicose veins. Id.  Dr. Rubin prescribed the drug Flexeril[26] 10 mg as needed. Id.

On June 14, 2007, Tuttle was discharged from physical therapy. Tr. 277.  According to the physical therapist at the time of Tuttle's discharge Tuttle was unable to lift items weighing more than 10 pounds and he still had range of motion limitations.  Specifically, with respect to lumbar flexion and extension he had a 50% decrease in active range of motion and a 25% decrease in left lateral flexion. Id.

On June 18, 2007, Tuttle had an appointment with Dr. Boriosi. Tr. 236.  Dr. Boriosi's mental status findings were benign. Id.  He noted that Tuttle was was friendly, alert and cooperative; Tuttle denied

26.  Flexeril is a drug that helps to relax the muscles. Flexeril, Drugs.com, http://www.drugs.com/flexeril.html (Last accessed August 25, 2011).

suicidal and homicidal thoughts; and Tuttle denied drug and alcohol usage. Dr. Boriosi stated that Tuttle was "doing better" and continued Tuttle's ongoing therapy and medication. Id. The record does not specify Tuttle's medications, other than Celexa. Id.

On July 9, 2007, John D. Chiampi, Ph.D., a psychologist, reviewed Tuttle's medical records on behalf of the Bureau of Disability Determination. Tr. 240-255. Dr. Chiampi concluded that Tuttle's impairments did not meet or equal the requirements of a listed mental impairment. Tr. 253. Dr. Chiampi concluded that Tuttle suffered from anxiety and depression and that he had some moderate limitations in his functional abilities, including that Tuttle was moderately limited in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and work in coordination with, or proximity to, others without being distracted by them. Tr. 240. Even with these mental limitations Dr. Chiampi concluded

33

that Tuttle "is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments. Tr. 242.

On July 24, 2007, Sharon A. Wander, M.D., completed on behalf of the Bureau of Disability Determination a form entitled "Physical Residual Functional Capacity Assessment." Tr. 256-261.  The form was completed based only on Dr. Wander's review of the medical records.  Dr. Wander did not examine Tuttle. Dr. Wander concluded that Tuttle could perform basically the full range of light work except Tuttle can never climb ladders, ropes or scaffolds but can occasionally use ramps and climb stairs and occasionally stoop. Tr. 258.  Dr. Wander also found that Tuttle should avoid concentrated exposure to vibration and hazards. Tr. 259.

On July 26, 2007, Tuttle had an appointment with Dr. Rubin. Tr. 278.  At that appointment Tuttle complained of a burning sensation in both shoulders and joint pain.  The physical examination revealed that Tuttle's blood pressure was 112/80 and he weighed 172

34

pounds. Id.  There were no abnormal physical examination findings noted. Id.  Dr. Rubin did note that the range of motion in Tuttle's shoulders was "OK." Id.  Under the impression section of Dr. Rubin's medical notes she states that Tuttle was suffering from bilateral shoulder spasms. Id.  Dr. Rubin recommended that Tuttle continue to take Motrin as needed and ordered x-rays of both of Tuttle's shoulders.

On August 7, 2007, Tuttle had an appointment with Dr. Batzel. Tr. 263-264.  Dr. Batzel is the physician who in March 2007, performed a lower extremity venous duplex evaluation. Tr. 226. Dr. Batzel's physical examination of Tuttle on August 7, 2007, revealed "significant varicose veins bilaterally with varicosities measuring up to a centimeter in diameter going over a course of about 40 cm to 50 cm on both legs." Tr. 263.  Dr. Batzel concluded that Tuttle suffered from "venous insufficiency of the bilateral lower extremities mainly characterized by an achy pain at the end of the day as well as varicose veins." Id.

Dr. Tuttle "reiterated [to Tuttle] the importance of elevation" and scheduled a follow-up appointment in three months. Tr. 264.

On August 22, 2007, Tuttle had x-rays of both shoulders which revealed "unremarkable soft tissue with no fracture or dislocation." Tr. 270-271 and 279.

On September 9, 2007, Tuttle had an appointment with Dr. Rubin.  Tr. 280.  At that appointment Tuttle complained of a burning sensation in both shoulders. Id.  The physical examination revealed that Tuttle's blood pressure was 120/70 and he weighed 178 pounds. Id.  There were no abnormal physical examination findings noted.  Id.  Dr. Rubin did note that x-rays of the shoulders were "OK." Id.  Under the impression section of Dr. Rubin's medical notes she states that Tuttle was suffering from chronic arthralgia of the shoulders and chronic lumbar radiculopathy. Id.  Dr. Rubin recommended that Tuttle continue to take Motrin as needed.  Id.

On September 19, 2007, Tuttle had an x-ray of
the abdomen which revealed a "[s]table nonobstructing
left renal calculus."  Tr. 281.

On September 21, 2007, Tuttle had an ultrasound
of the kidneys which revealed that the right kidney was
unremarkable and there was a stone in the midpole of the
"left kidney measuring 10 x 7 mm" with "[n]o
hydronephrosis[.]"[27] Tr. 282.

In September 2007, Tuttle had an appointment
with Dr. Boriosi. Tr. 285.[28]  Dr. Boriosi's mental status
findings were benign. Id.  He noted that Tuttle was
was friendly, alert and cooperative; Tuttle denied
suicidal and homicidal thoughts; and Tuttle denied drug
and alcohol usage.  Dr. Boriosi stated that Tuttle was
"doing better" and continued Tuttle's ongoing therapy

---

27.  Hydronephrosis is an abnormal dilation of the urine
collection system of a kidney.  The condition can be
caused by a kidney stone obstructing the flow of urine.
See generally, Hydronephosis, MedicineNet.com,
http://www.medicinenet.com/hydronephrosis/article.htm
(Last accessed August 25, 2011).

28.  The date is illegible.

and medication. Id.  The record does not specify

Tuttle's medications, other than Celexa. Id.

On October 10, 2007, Tuttle had a follow-up

appointment with Dr. Preate at Delta Medix Urology.  Dr.

Preate in his report of that appointment stated that

Tuttle

> is a 50 year old gentleman currently on Hytrin
> . . . for voiding dysfunction. His AUA symptom
> score is 9/35[29] and he rates the quality of his
> life as 'mostly satisfied.' He has a PSA within
> normal limits and he has a family history for
> prostate cancer which was negative.  He also has
> a history of nonobstructing left renal calculus
> which he keeps under observation and this was
> confirmed by Renal Ultrasound and KUB.

Tr. 274.

When Dr. Preate reviewed Tuttle's systems with

Tuttle, Tuttle denied suffering from nausea, vomiting,

fevers, chills, headaches, dizziness, blurry vision,

loss of vision, vertigo, chest pain, palpitations,

pulmonary difficulties (such as shortness of breath),

---

29.  A self-reported score of 9 out of 35 is considered
moderate.  Englarged Prostate and Your BPH Symptoms
Score, WebMD,http://men.webmd.com/enlarged-
prostate-your-bph-symptoms-score (Last accessed August
23, 2011).

breathing problems, wheezing, gastrointestinal discomfort or pain, diarrhea, cachexia, anorexia, hematochezia, constipation, significant weight loss, major musculoskeletal problems, skin abnormalities, bleeding tendencies, and neurological deficits.

Dr. Preate in his report of the appointment noted Tuttle's reported history of nephrolithiasis (kidney stones) as well as voiding dysfunction and under the physical examination portion of his report noted no abnormal findings. Specifically, Dr. Preate stated "[h]e has no costovertebral angle tenderness.  The paraspinal muscles are without discomfort or pain to palpation." Tr. 275.  He further stated that Tuttle's "mood and affect are clear and appropriate."  Id.

Dr. Preate's impression was that Tuttle was suffering from a voiding dysfunction, a history of right sided flank pain, a history of non-obstructing kidney stones, and a history of smoking. Tr. 276.  Dr. Preate continued Tuttle on the drug Hytrin, ordered a renal ultrasound, a kidney, ureter and bladder (KUB) x-ray and

blood tests, and scheduled a follow-up appointment in one year. Id.

On December 14, 2007, Tuttle had an appointment with Dr. Rubin.  Tr. 284.  At that appointment Tuttle complained of pain past his left calf. Id.  The physical examination revealed that Tuttle's blood pressure was 120/80 and he weighed 185 pounds. Id.  There were no abnormal physical examination findings noted. Id.  Under the impression section of Dr. Rubin's medical notes she states that Tuttle was suffering from varicose veins, disease of the spine and depression. Id.

In February 2008, Tuttle had an appointment with Dr. Boriosi. Tr. 285.[30]  Dr. Boriosi's mental status findings appear to be benign. Id.  He noted that Tuttle was friendly and cooperative; Tuttle denied suicidal and homicidal thoughts; and Tuttle denied drug and alcohol usage.  It is not clear whether Dr. Boriosi found Tuttle depressed or alert.  The check mark appears to be in front of the word "depressed."  The quality of the

30.  The date is illegible.

medical record is poor.  Dr. Boriosi stated that Tuttle was "doing good" and continued Tuttle's ongoing therapy and medication. Id.  The record does not specify Tuttle's medications, other than Celexa. Id.

On March 12, 2008, Tuttle had an appointment with Dr. Rubin. Tr. 289.  At that appointment Tuttle complained of lower back pain and stomach problems. Id. The physical examination revealed that Tuttle's blood pressure was 120/70 and he weighed 178 pounds. Id. There were no abnormal physical examination findings noted. Id.  Under the impression section of Dr. Rubin's medical notes she states that Tuttle was suffering from gastroesophageal reflux disease and chronic back problems. Id.  Dr. Rubin prescribed the drug Prilosec and continued Tuttle on his other medications. Id.  Dr. Rubin did note that Tuttle smoked one pack of cigarettes per day and had a smoker's cough. Id.

On March 13, 2008, Tuttle had a chest x-ray done which revealed "[f]indings consistent with COPD" but "[n]o evidence of acute cardiopulmonary disease."  Tr.

41

290. The x-ray was reviewed by Charles Barax, M.D. Tr. 291.

On June 12, 2008, Tuttle had an appointment with Dr. Rubin. Tr. 288.  At that appointment Tuttle complained of back pain which radiated to his right leg. Id.  The physical examination revealed that Tuttle's blood pressure was 140/90 and he weighed 184 pounds. Id.  There were no abnormal physical examination findings noted other than his blood pressure. Id.  Under the impression section of Dr. Rubin's medical notes she stated that Tuttle was suffering from gastroesophageal reflux disease and chronic back problems. Id.  Dr. Rubin continued Tuttle on the drug Prilosec and his other medications. Id.

The last medical appointment of which there is a record of in the transcript of the administrative proceedings occurred on September 11, 2008.  Tr. 287. On that date Tuttle had an appointment with Dr. Rubin. The physical examination revealed that Tuttle's blood pressure was 110/74 and he weighed 184 pounds. Id.

There were no abnormal physical examination findings noted. Id.  Under the impression section of Dr. Rubin's medical notes she states that Tuttle was suffering from gastroesophageal reflux disease and chronic disc disease of the back. Id.  Dr. Rubin continued Tuttle on all of his medications. Id.

**DISCUSSION**

The administrative record in this case is 291 pages[31] in length and has been thoroughly reviewed. Tuttle argues that the administrative law judge erred in finding that his symptoms and their limiting effects upon him were not credible and that the administrative law judge erred at step three of the sequential

_____

31. As stated earlier in this order pages 81-94 are missing from the record.

evaluation process in finding that his impairments did not meet or equal the requirements of a listed impairment. Tuttle's argument that the administrative law judge erred at step three need not be addressed because the court concludes that the administrative law judge committed errors at steps two and four of the sequential evaluation process and those errors impact the administrative law judge's assessment of Tuttle's credibility.

The administrative law judge, at step one of the sequential evaluation process, found that Tuttle had not engaged in substantial gainful work activity since July 1, 2006, the alleged onset date of his conditions. Tr. 13.

Step two of the sequential evaluation process, is where the administrative law judge first committed a legal and factual error. At step two, the administrative law judge found that Tuttle suffers from the following severe impairments: degenerative disc disease of three lower discs of the lumbar spine and

levoscoliosis of the lumbar spine. Tr. 13.  The
administrative law judge found that Tuttle has no severe
mental impairments and that Tuttle's voiding dysfunction
and kidney stone were nonsevere impairments. Tr. 14.
The administrative record, however, reveals that Tuttle
was diagnosed with several other conditions and the
administrative law judge did not make a determination as
to whether or not those conditions were medically
determinable impairments.  Tuttle was diagnosed with
gastroesophageal reflux disease, chronic obstructive
pulmonary disease, venous insufficiency in the bilateral
lower extremities and lumbar radiculopathy.

 The determination of whether a claimant has any
severe impairments, at step two of the sequential
evaluation process, is a threshold test. 20 C.F.R. §
404.1520(c).  If a claimant has no impairment or
combination of impairments which significantly limit the
claimant's physical or mental abilities to perform basic
work activities, the claimant is "not disabled" and the
evaluation process ends at step two. Id.   If a claimant

has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two.  However, all of the medically determinable impairments both severe and non-severe must be considered at step four when setting the residual functional capacity.  The failure of the administrative law judge to find the above noted conditions as medically determinable impairments, or to give an adequate explanation for discounting them, makes his decision at step four of the sequential evaluation process defective.

At step three of the sequential evaluation process the administrative law judge found that Tuttle did not have an impairment or combination of impairments that met or equaled a listed impairment. Tr. 14.  The administrative law judge merely stated as follows: "The undersigned considered listing 1.04. The Claimant does

46

not have the neurological deficits required by the listing." Id.[32]

At step four of the sequential evaluation process the administrative law judge found that Tuttle was unable to perform his prior relevant work but that Tuttle had the residual functional capacity to perform a limited range of light work. Tr. 14.[33] Specifically, the administrative law judge found that Tuttle could perform light work, including standing and walking for up to 6 hours per day with a sit/stand option.  The administrative law judge further found that Tuttle could

---

32.  The court does not believe that the administrative law judge's two sentence explanation for finding that Tuttle's impairments did not meet or equal a listed impairment is sufficient.

33.  At the time of the administrative hearing Tuttle was 51 years of age.  Under the Social Security regulations a person 50 to 54 years of age is considered a "person closely approaching advanced age." 20 C.F.R. §§ 404.1563(c) and 416.963(c).  The Social Security Administration considers a claimant 50 to 54 who has a severe impairment and limited work experience as someone who may not be able to adjust to other work. Id.  If Tuttle would have been limited to sedentary work by the administrative law judge, he may have been entitled to disability benefits. See Medical-Vocational Rule 201.14, 20 C.F.R. P. 404, Subpart P, App. 2.

occasionally operate foot controls.  In so finding the
administrative law judge gave significant weight to the
opinion of Dr. Parmelee.

In order to be found capable of performing light
work, an individual must be able to engage in a
significant amount of walking or standing.  Soc. Sec,
Ruling 83-10.  A significant amount of walking or
standing has been defined as six hours out of an eight-
hour workday. Id.(["Since frequent lifting or carrying
requires being on one's feet up to two-thirds of a
workday, the full range of light work requires standing
or walking, off and on, for a total of approximately six
hours of an eight-hour workday."); Jesurum v. Secretary
D.H.H.S., 48 F.3d 114, 119 (3d Cir. 1995); Carter v.
Sullivan, 909 F.2d 1201, 1202 (8th Cir. 1990).  Light
work as noted earlier in this order also requires that
the individual be able to frequently lift and carry ten
pounds and occasionally lift and carry twenty pounds.

In his step four analysis the administrative law
judge stated that Dr. Parmelee was of the opinion that

Tuttle was capable of light work.  This is an erroneous characterization of Dr. Parmelee's assessment.

Dr. Parmelee stated that Tuttle's cumulative capacity in a eight-hour workday to stand and walk with a sit/stand option was only four hours. Tr. 204.  Also, Dr. Parmelee did not render an opinion as to the weight that Tuttle could lift or carry on a frequent basis. Instead she merely stated that Tuttle could occasionally lift ten pounds and occasionally carry twenty pounds. Furthermore, Dr. Parmelee stated Tuttle should avoid right foot pedal movements. Tr. 204.  The administrative law judge's reliance on Dr. Parmelee's opinion was erroneous.  The administrative law judge also in a cursory fashion commented on the physical therapists conclusion that Tuttle could not lift more than ten pounds. Tr. 15.

The only medical evidence in the record which supports the administrative law judge's conclusion that Tuttle could perform light work is an assessment of Tuttle's functional abilities conducted by Dr. Wander, a

49

physician working for the Bureau of Disability
Determination.   The administrative law judge gave Dr.
Wander's opinion "great weight." Tr. 16.  Dr. Wander who
merely performed a medical records review and did not
examine or treat Tuttle concluded that Tuttle had the
ability to occasionally lift or carry twenty pounds,
frequently lift or carry ten pounds, stand or walk six
hours in and eight-hour workday, and sit six hours in an
eight-hour workday; Tuttle had unlimited ability to push
and pull with the upper or lower extremities other than
the twenty and ten pound limitations for carrying and
lifting; Tuttle could frequently, balance, kneel, crouch
and crawl and occasionally climb ramps, stairs but never
climb ladders, ropes or scaffolds; Tuttle had no
manipulative, visual or communicative limitations; and
Tuttle had no environmental limitations other than he
should avoid concentrated exposure to hazards and
vibration.  Tr. 256-259.  Dr. Wander only reviewed the
medical records existing as of July 24, 2007, and she
stated that the only medically determinable impairments

50

of which Tuttle suffered from were a history of a kidney stone, benign prostatic hyperplasia and low back pain. Tr. 256 and 261.  She also recognized that Dr. Parmelee's assessment was more restrictive and rejected it.  Tr. 262.

At step five, the administrative law judge based on his conclusion that Tuttle could engage in light work and the testimony of a vocational expert found that Tuttle had the ability to perform work as a hand trimmer, a cleaner or janitor, a courier, clerk or mail sorter, and a laundry folder, and that there were a significant number of such jobs in the Northeastern region of Pennsylvania.  Tr. 17-18

Dr. Wander's assessment was dated July 24, 2007. After that date Tuttle received additional medical treatment and the administrative law judge's hearing was held on December 3, 2008, approximately 16 months after Dr. Wander issued her assessment. In this case we have (1) a physician, Dr. Parmelee, who provided an assessment based on an actual examination of Tuttle

which assessment suggests that Tuttle is not able to perform the light work found by the administrative law judge and (2) a physical therapist who provided an assessment based on an actual examination and treatment of Tuttle which also precludes Tuttle from engaging in light work.  The only contrary medical evidence is that provided by Dr. Wander who did not examine Tuttle and did not consider all of Tuttle's impairments demonstrated by the medical records.

The errors at step two and four of the sequential evaluation process, draw into question the administrative law judge's residual functional capacity determination and assessment of the credibility of Tuttle.  The administrative law judge found that Tuttle's medically determinable impairments could reasonably cause Tuttle's alleged symptoms but that Tuttle's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible.  This determination by the administrative

law judge was based on an incomplete analysis of all of Tuttle's medically determinable impairments.

Also, the administrative law judge in evaluating Tuttle's credibility did not consider his lengthy work history.  As noted earlier in this order, Tuttle has a 32-year work history.  "When a claimant has worked for a long period of time, [his] testimony about [his] work capabilities should be accorded substantial credibility."  Rieder v. Apfel, 115 F.Supp.2d 496, 505 (M.D.Pa. 2000)(Munley, J.)(citing Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979)).  The administrative law judge did not give an adequate reason for discrediting Tuttle's testimony.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

53

An appropriate order will be entered.


    s/Sylvia H. Rambo
United States District Judge

Dated:  September 7, 2011.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TIMOTHY A. TUTTLE,           :
                             :
        Plaintiff            :      CIVIL NO. 4:10-CV-1392
                             :
    vs.                      :
                             :
MICHAEL J. ASTRUE,           :
COMMISSIONER OF SOCIAL       :      (Judge Rambo)
SECURITY,                    :
                             :
        Defendant            :


ORDER AND JUDGMENT

In accordance with the accompanying memorandum,
**IT IS HEREBY ORDERED THAT:**

1.  The Clerk of Court shall enter judgment in
favor of Timothy Tuttle and against the Commissioner of
Social Security as set forth in the following paragraph.

2.   The decision of the Commissioner of Social Security denying Timothy Tuttle disability insurance benefits and supplemental security income benefits is vacated and the case remanded to the Commissioner of Social Security to:

2.1 Conduct a new administrative hearing and appropriately evaluate the medical evidence and the credibility of Timothy Tuttle in accordance with the background of this order.

3.   The Clerk of Court shall close this case.


                              s/Sylvia H. Rambo
                          United States District Judge

Dated:  September 7, 2011.